UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DANTAY YVETTE BLACKWELL, | ) |
| Plaintiff, | ) |
| v. | ) No. 3:16-cv-03160 |
| | ) Judge Trauger |
| | ) Magistrate Judge Brown |
| NANCY BERRYHILL,[1] | ) |
| Acting Commissioner of | ) |
| Social Security, | ) |
| Defendant. | ) |

To: The Honorable Aleta A. Trauger, United States District Judge

## REPORT AND RECOMMENDATION

Pending before the court is the *pro se* Plaintiff's motion for judgment on the administrative record (Docket Entry No. 16), to which Defendant Commissioner of Social Security ("Commissioner") filed a response (Docket Entry No. 17). Upon consideration of the parties' filings and the transcript of the administrative record (Docket Entry No. 13),[2] and for the reasons given herein, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record be **DENIED** and that the decision of the Commissioner be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff, Dantay Yvette Blackwell, filed an application for supplemental security income ("SSI") under Title XVI of the Social Security Act on March 7, 2013, alleging disability onset as of June 1, 2006, due to epilepsy. (Tr. 10, 64, 72, 165). Plaintiff's claim was denied at the initial level

---

[1] Nancy Berryhill became acting Commissioner for the Social Security Administration on January 23, 2017, and is therefore substituted as Defendant. *See* Fed. R. Civ. P. 25(d).

[2] Referenced hereinafter by page number(s) following the abbreviation "Tr."

on July 3, 2013, and on reconsideration on October 14, 2013. (Tr. 10, 64-88). Plaintiff subsequently requested *de novo* review of her case by an administrative law judge ("ALJ"). (Tr. 90-92). The ALJ heard the case on April 8, 2015, when Plaintiff appeared *pro se* and gave testimony. (Tr. 10, 27-53, 55-63). Testimony was also received by a vocational expert. (Tr. 53-55). At the conclusion of the hearing, the matter was taken under advisement until October 6, 2015, when the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 6-21). That decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since March 7, 2013, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: seizure disorder; headaches; sleep apnea; and obesity (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels except that she should avoid all exposure to hazards.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on March 24, 1974 and was 38 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

        national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since March 7, 2013, the date the application was filed (20 CFR 416.920(g)).

(Tr. 12-13, 19-21).

On November 4, 2016, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## II. REVIEW OF THE RECORD

The following summary of the medical record is taken from the ALJ's decision:

The claimant alleges a disability onset date of June 1, 2006, based epilepsy. Exhibit l F includes an undated letter from neurologist Dr. Richard T. Hoos addressed to Dr. Keith Junior of the Waverly-Belmont Clinic detailing the claimant's history of epilepsy. The letter notes the claimant's age as thirty-one, so it was obviously completed sometime between March 2005 and March 2006 based on the claimant's birthday. Dr. Hoos reported that the claimant typically had a reliable premonitory sensation described as a "funny feeling in her head" as well as staring attacks and continued activity. He noted that the claimant's seizures typically progressed to blacking out and falling down with incontinency and tongue or lip-biting. At the time the letter was written, the claimant had been taking Lamictal since November 2004 and her last seizure had occurred a month before the letter was written. On examination, Dr. Hoos noted that the claimant weighed two hundred and sixty-eight pounds, but his findings were otherwise unremarkable. He prescribed the claimant Topamax and continued on her Lamictal. Exhibit l F.

On March 13, 2006, it was noted that the claimant was doing okay and that she had not had any seizures, and on July 5, 2006, she reported feeling good. The next medical record is dated February 8, 2007, and it shows that the claimant reported having a seizure two days prior. The next record is dated December 12, 2008, and it reflects that the claimant reported having many seizures and being off of Lamictal for about a year. It was noted that her seizures had probably been well-controlled on her previous dose of Lamictal but that she frequently forgot to take her medication. Exhibit lF.

3

There is another long gap in the claimant's medical records until September 16, 2010, when it was noted that she had run out of Lamictal about two years prior and was again having several seizures. She was restarted on Lamictal. Exhibit 1F. On January 19, 2011, she presented to United Neighborhood Health Services and reported that her last seizure had occurred in November 2010. She was diagnosed with chronic convulsions. Except for weighing two hundred and fifty-four pounds, she had an unremarkable respiratory, cardiovascular, and musculoskeletal examination. Exhibit 2F.

The claimant returned to United Neighborhood Health Services on July 9, 2012. She reported that her last seizure had occurred five months prior and that she had been out of her seizure medication since May 2011. However, she then stated that she had been out of her medication since January 2011 because she did not like her neurologist and did not follow up with him after her last appointment in September 2010. It was noted that the claimant had grand mal seizures and that she had been non-compliant with both appointments and medications. She was referred to a different neurologist. She was also diagnosed with morbid obesity based on her body mass index of approximately forty-three. Exhibit 2F.

On August 6, 2012 the claimant met with neurologist Dr. Ajay K. Shukla for an evaluation. She reported that her last generalized tonic-clonic seizure had been about a year prior and that she had since had several episodes of only mild seizures. She had an unremarkable examination with normal strength, intact sensation, normal gait and coordination, and intact cognition. She also had unremarkable cardiovascular and respiratory examinations. Dr. Shukla diagnosed the claimant with seizure disorder, gave her a refill of Lamictal, and referred her for a brain MRI and an extended EEG. Exhibit 4F.

The claimant had a normal brain MRI that showed no evidence of seizure-producing foci as well as a normal EEG. Exhibits 4F and 5F. At a follow-up visit to Dr. Shukla on October 15, 2012, the claimant reported that she had been taking the incorrect dosage of Lamictal but that she had only been having some intermittent dizziness and headaches. She denied having any generalized tonic-clonic seizures. She was diagnosed with complex partial seizure evolving to generalized seizure, continued on Lamictal, and started on folic acid tablets.

On January 15, 2013, the claimant reported having daily staring spells and intermittent headaches and dizziness. However, she denied having any losses of consciousness. On examination, she had a body mass index of approximately forty-one but normal strength and intact sensation. Dr. Shukla diagnosed her with complex partial seizure evolving to generalized seizure and headache. He prescribed her Keppra and continued her on Lamictal. Exhibit 4F.

At a follow-up visit to Dr. Shukla on March 21, 2013, the claimant was observed having a staring spell followed by a loss of balance and altered consciousness to her surroundings. It was noted that the episode only lasted for about one minute. The claimant was continued on her same medication regimen. Exhibit 4F.

On May 21, 2013, the claimant complained of frequent dizziness and tiredness. She blamed her medications, but it was noted that her medication levels were in the normal range. She denied having any breakthrough seizure activity since her previous visit. She was again continued on her same medication regimen. Exhibit 4F.

On June 16, 2013, the claimant completed a function report in which she endorsed caring for her fifteen-year-old son, performing hygiene tasks without any problems, preparing meals, housecleaning, doing laundry, shopping, managing her finances, reading, and talking with her mother and best friends over the phone. She stated that she did not drive because of her seizure disorder. She alleged having problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, remembering, completing tasks, concentrating, understanding, following instructions, and using her hands. However, when asked to explain, she wrote, "When you have a seizure all of these things ar [sic] affected." Exhibit 3E.

On August 26, 2013, the claimant reported having "very few episodes" of intermittent dizziness, headaches, and "very mild" confusion without any generalized tonic-clonic seizure activity. She was diagnosed with complex partial seizure, headache, and dizziness; continued on Lamictal, and prescribed an increased dosage of Keppra. Exhibit 5F.

On October 14, 2013, the claimant reported that she had been having itching all over her body for a long time that began after she started taking Lamictal. It was noted that she had never complained of itching before. Because of this alleged adverse side effect, the claimant ended up discontinuing both Lamictal and Keppra in mid-September. She denied having any breakthrough seizures, but it was noted that she had several bruises on her left forearm. The claimant reported that she had fallen to the ground, but she could not recall any details. She was prescribed an increased dosage of Keppra. Exhibit 5F.

At a follow-up visit to Dr. Shukla on November 14, 2013, the claimant reported having a breakthrough seizure a week prior. She was prescribed another increased dosage of Keppra and restarted on folic acid tablets. The claimant was subsequently prescribed Topamax on January 6, 2014, after complaining of frequent headaches that occurred at least three to four times a week with moderate intensity. She denied having any seizure activity. Exhibit 5F.

5

On March 11, 2014, the claimant reported that her headaches had decreased in intensity to a four to five out of ten (with ten being the worst pain) and decreased in frequency to once or twice a week. She again denied having any seizure activity, and her seizures were noted to be in "good control" on Keppra. She was prescribed an increased dosage of Topamax for her headaches, and at a follow-up visit to Dr. Shukla on May 5, 2014, she reported that her headaches had decreased in frequency to three to four times a month and that Keppra had "significantly helped" with her headaches. It was noted that she had not had any seizure activity since October 2013, although based on previously discussed treatment records, her last seizure had actually occurred in November 2013. On examination, the claimant had a body mass index of approximately forty-one but normal strength and intact sensation. Exhibit 5F.

On July 21, 2014, the claimant again denied having any seizure activity. She complained of some breakthrough headaches that occurred about once or twice a week but stated that the intensity was "not bad" with a pain rating of four to five out of ten. The claimant also reported having excessive daytime tiredness and snoring, and she stated that she sometimes fell asleep while watching television or talking. Dr. Shukla diagnosed her with obstructive sleep apnea and referred her for a sleep study. Exhibit 5F.

At a follow-up visit on September 4, 2014, the claimant reported that she was still having headaches once or twice a week of the same intensity. She was prescribed an increased dosage of Topamax. She again denied having any seizure activity. It was noted that a sleep study was scheduled for the following day. Exhibit 5F. However, the next medical record, dated March 9, 2015, shows that the sleep study was not approved by the claimant's insurance provider despite her having an Epworth Sleepiness Scale score of eighteen, a subjective indication of severe apnea. It was noted that the claimant's seizures were in remission, but the claimant reported having frequent headaches on an almost daily basis with a pain rating of three to eight out of ten. She also complained of being forgetful about simple information such as names and phone numbers. The claimant was continued on Keppra and Topamax for her seizures and headaches and again referred for a sleep study. Of note, she had a body mass index of approximately forty-three but continued to have normal strength and intact sensation. Exhibit 6F.

On May 6, 2015 the claimant again denied having any seizure activity, but she reported having significant dizziness on a fairly regular basis and frequent headaches that occurred three to four times a week. However, she rated her headaches a two to five out of ten, indicating decreased severity. It was noted that a sleep study had again been denied by her insurance provider. She was prescribed an increased dosage of Topamax and again referred for a sleep study. Exhibit 6F.

The nex1and last treatment record from Dr. Shukla is dated August 21, 2015, and shows that the claimant was again denied for a sleep study. She was continued on her same medication regimen. Exhibit 7F.

No additional medical records were provided.

(Tr. 14-17).

The ALJ summarized Plaintiff's testimony as follows:

Turning to the hearing testimony, the claimant testified that she cannot work because of her seizure disorder. She stated that her last seizure was in October 2014, but this is not corroborated by treatment records which show that she has not had a seizure since November 2013. The claimant testified that she has not gone to the hospital for a seizure since 2010 when she had a car accident while having a seizure. She stated that she mainly has blackout seizures about once or twice a month rather than grand mal seizures. She stated that she will blackout for about ten minutes and then come to but will not be physically hurt. The claimant testified that her last grand mal seizure was in 2010.

Regarding her medications, the claimant testified that Keppra causes sleepiness and poor coordination and that her doctor prescribes the current dosage because he knows that she does not work. However, she stated that she is able to do household chores and shop for groceries . She stated that she otherwise stays at home and does not go anywhere. Further, treatment records do not show that the claimant complained of such significant adverse side effects.

Of note, the claimant testified that she stopped working in 2009 because she was working at night, going to school full-time, and doing work study. She stated that she stopped attending school in 2010 but that she is thinking about returning to school. She testified that she would have seizures in class but that they never impacted her work. When asked why her seizures impact her ability to work now, she responded that it would depend on the type of job. She then admitted that she has not looked for work since applying for disability because she did not think that she could work if she applied for disability.

Of note, the claimant denied having any other impairment that affected her ability to work. She stated that she still has headaches but that they are controlled.

(Tr. 17-18).

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

7

Review of the Commissioner's disability decision is narrowly limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the right legal standards in reaching the decision. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence requires 'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the Commissioner's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387 (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton*, 246 F.3d at 773 (citations omitted). However, where an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller,* 811 F.3d at 833 (citation and internal quotation marks omitted).

## B. Administrative Proceedings

The claimant has the ultimate burden of establishing his entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) ("[T]he claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The Commissioner applies a five-step inquiry to determine whether an individual is disabled within the meaning of the Social Security Act, as described by the Sixth Circuit as follows:

> (1) a claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings; (2) a claimant who does not have a severe impairment will not be found to be disabled; (3) a finding of disability will be made without consideration of vocational factors if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four; (4) a claimant who can perform work that he has done in the past will not be found to be disabled; and (5) if a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520; 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations his impairments cause and the fact that he cannot perform past relevant work; however, at step five, "the burden

shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . ." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The Social Security Administration can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). The grids otherwise only function as a guide to the disability determination. *Wright*, 321 F.3d at 615-16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert ("VE") testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the Commissioner must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Claims of Error

Plaintiff argues that "any fair minded person would conclude that my seizure disorder keeps me from working" and that the ALJ's decision was not supported by substantial evidence. (Docket Entry No. 16, at 1). Plaintiff also argues that her anti-seizure medications make her tired and weak. *Id*. Defendant contends that substantial evidence supports the ALJ's evaluation of and findings regarding Plaintiff's seizure disorder. (Docket Entry No. 17, at 4).

The ALJ concluded that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (Tr. 18). The ALJ thoroughly reviewed the medical records and explained:

> The medical records do not fully support the level of limitation the claimant alleges. Treatment records from prior to the application date show that the claimant had a history of non-compliance with taking her seizure medication but that her seizures were controlled when she took her medication. Records from Dr. Shukla, the claimant's current treating neurologist, show that the claimant had a normal brain MRI and EEG and that she reported having mainly mild seizures. At the hearing, the claimant testified to having staring spells once or twice a month that lasted for about ten minutes, and she stated that she last had an actual seizure in October 2014. However, Dr. Shukla's records show that the claimant has not had a seizure since November 20 13, and there is no documented evidence that she has staring spells once or twice a month. In March 2014, her seizures were noted to be in "good control," and in March 2015 they were noted to be in remission. The claimant testified that she stopped working, not because of her impairments, but because she was working at night, going to school full-time, and doing work study. She stated that she had seizures while attending school but that they did impact her work. She further indicated that she could perform work activity depending on the type of job and that the only reason she has not looked for work was because she did not think she could work after applying for disability. Overall, treatment records show that the claimant's seizures are well-controlled with medication, and per the claimant's testimony, her seizures did not impact her ability to work and attend school and do not actually preclude all work activity.
>
> The undersigned has also considered obesity, sleep apnea, and headaches as severe impairments. However, the claimant testified that her seizure disorder is her only issue. She stated that she still has headaches but that they are controlled with medication and not as severe. Records from Dr. Shukla show that the claimant

reported improved frequency and severity of her headaches with medication. Of note, the claimant complained of forgetfulness in March 2015, but subsequent records do not reflect any reported cognitive concerns. As for the claimant's sleep apnea, she was never approved for a sleep study to confirm the severity of her alleged symptoms. She had an Epworth Sleepiness Scale of eighteen, but this was based on her responses to a self-administered questionnaire. Further, per her testimony, her apnea does not impact her ability to work. Lastly, the claimant's weight has remained above obesity level, but she consistently had unremarkable physical examinations.

The claimant testified that Keppra causes sleepiness and poor coordination. However, treatment records do not reflect such complaints with regard to the claimant's medication. Further, per her testimony, she can work depending on the type of job.

The claimant's function report at Exhibit 4E and her hearing testimony both show that she is able to do daily living activities without any significant problems. Further, while the claimant indicated in her function report having problems with practically all of the listed physical and mental tasks, she then noted that these activities were affected when she had seizures. Accordingly, because her seizures are controlled with medication, there is no evidence to support any physical or mental work-related limitations other than what is reflected in the above residual functional capacity.

As for the opinion evidence, the undersigned gives great weight to the State agency medical consultants' assessments at Exhibits 1A and 3A that the claimant has no exertional, manipulative, postural, visual, or communicative limitations but that she should avoid all exposure to hazards. This is consistent with the unremarkable physical examinations while taking into consideration the claimant's obesity, any residuals from her headaches and sleep apnea, and her seizure disorder. Her seizures and headaches are controlled with medication, and there is no evidence to support more restrictive limitations for her obesity and sleep apnea than the limitation to avoid all hazards.

(Tr. 18-19).

Denial of disability benefits is supported when an individual's impairments are improved with medications. *See Smith v. Comm'r of Soc. Sec. Admin.*, 564 F. App'x 758, 763 (6th Cir. 2014) (citing *Hardaway v. Secretary*, 823 F.2d 922, 927 (6th Cir.1987) "(evidence that medical issues can be improved when using prescribed drugs supports denial of disability benefits)"); 20 C.F.R. §

416.924a(b)(9)(i) (the ALJ will consider the effects of medications on symptoms). Further, "[a]n ALJ may consider noncompliance with treatment as a credibility factor." *Robertson v. Colvin*, No. 4:14-CV-35, 2015 WL 5022145, at *6 (E.D. Tenn. Aug. 24, 2015); *Ranellucci v. Astrue*, No. 3:11-cv-00640, 2012 WL 4484922, *10 (M.D. Tenn. Sept. 27, 2012). The record reflects that Plaintiff was often non-compliant with her prescribed treatment, but that Plaintiff's seizure condition was controllable with medication. "[T]he claimant bears the burden of producing sufficient evidence to show the existence of a disability." *Watters v. Comm'r of Soc. Sec. Admin.*, 530 F. App'x 419, 425 (6th Cir. 2013).

The record shows that in March and July 2006 Plaintiff was doing well on Lamictal and had no seizures. (Tr. 14, 230-31). In December 2008, Plaintiff reported having many seizures and being off Lamictal for about a year. (Tr. 14, 228). Dr. Hoos noted that Plaintiff's seizures may have been well-controlled, but that she frequently forgot to take her Lamictal. (Tr. 14, 228). Dr. Hoos noted in September 2010 that Plaintiff had not been taking Lamictal for about the past two years and that she was having seizures. (Tr. 14, 227). In July 2012, Plaintiff reported that she had a seizure in or around February 2012 and that she had been off her medication since January 2011. (Tr. 14-15, 238). The doctor noted that Plaintiff had been non-compliant with both appointments and medications. (Tr. 15, 239).

On August 6, 2012, Dr. Shukla noted that Plaintiff's last generalized tonic-clonic seizure was about a year prior and that she had experienced several episodes of only mild seizures. (Tr. 15, 253). Plaintiff's examination was unremarkable and showed normal strength, intact sensation, normal gait and coordination, intact cognition, and normal cardiovascular and respiratory functions. (Tr. 15, 254). On August 13, 2012, the MRI of Plaintiff's brain was normal and showed no evidence of

seizure-producing foci, and Plaintiff's EEG was also normal. (Tr. 15, 251, 256). In October 2012, Plaintiff reported taking an incorrect dosage of Lamictal, but only reported some intermittent dizziness and headaches, and denied having any generalized tonic-clonic seizures. (Tr. 15, 251). Plaintiff complained of frequent dizziness and tiredness on May 21, 2013, which she blamed on her medication, but Dr. Shulka noted that her lab results and medications were in the normal range. (Tr. 15, 245). Plaintiff denied any breakthrough seizure activity since her previous visit and was continued on her same medication regimen. (Tr. 15, 245).

On August 26, 2013, Plaintiff reported tiredness, very few episodes of intermittent dizziness, headaches, and very mild confusion without any generalized tonic-clonic seizure activity. (Tr. 16, 276). Plaintiff believed that her Lamictal and Keppra made her seizures better. (Tr. 276). In September 2013, Plaintiff discontinued her seizure medications due to itching, although she had never complained of such a reaction to the medication. (Tr. 16, 274). Dr. Shulka discontinued the Lamictal, but continued the Keppra with an increase in dosage. (Tr. 16, 275). Plaintiff's medical records reflect that Plaintiff last reported having a seizure in November 2013, and that on March 9, 2015, Dr. Shukla noted that Plaintiff's seizures were in remission. (Tr. 16, 18, 272, 292). The medical records also reflect that for her headaches Dr. Shulka prescribed Plaintiff Topamax, which significantly helped reduced the frequency and intensity of the headaches. (Tr. 16, 261-71).

The ALJ noted that in a June 2013function report, Plaintiff stated that she prepares sandwiches and frozen dinners, is able to do cleaning and laundry without help and grocery shops twice a month. (Tr. 15, 193-94). In her September 2013 disability report, Plaintiff stated that her illness did not affect her care for her personal needs. (Tr. 202). The ALJ may consider daily activities as one factor in the evaluation of subjective complaints. *See Temples v. Comm'r of Soc.*

*Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) ("[T]he ALJ did not give undue consideration to Temples' ability to perform day-to-day activities. Rather, the ALJ properly considered this ability as one factor in determining whether Temples' testimony was credible."); 20 C.F.R. § 416.929 (2015).

At the ALJ hearing, Plaintiff testified that she stopped working in 2009, not because of her impairments, but because she was working at night, while going to school full-time and doing work study. (Tr. 18, 48). Plaintiff testified that she had seizures at school, but that they did not impact her work at school. (Tr. 18, 49). When asked how her impairment would keep her from returning to work, Plaintiff testified that "it would depend on the type of job." (Tr. 18, 49). Plaintiff stated that she had not looked for a job because she did not believe that she could work after she applied for disability. (Tr. 18, 49-50).

As to Plaintiff's claim that her medication makes her weak and drowsy and causes poor coordination, the ALJ noted that she was able to do household chores and shop for groceries, and that her treatment records did not show she complained of such significant side effects. (Tr. 18-19, 52-53). Plaintiff testified that she did not ask her doctor to modify her dosage because she "guess[es] he figures since [she] [doesn't] work then it's not a problem." (Tr. 52-53). In May 2013, Plaintiff complained of dizziness and tiredness, blaming it on her medication. (Tr. 245). However, Dr. Shukla noted that her medication levels were in the normal range. (Tr. 15, 245). The medical records do not reflect that Plaintiff made any other complaints to Dr. Shukla regarding her medications as being the cause of her drowsiness. Moreover, there are no medical records assessing Plaintiff's tiredness as being attributable to her medication. The ALJ also noted, per Plaintiff's testimony, that Plaintiff believed that she could work depending on the type of job. (Tr. 19, 49).

15

As a result, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels except that she should avoid all exposures to hazards. (Tr. 13). The vocational expert testified that given Plaintiff's RFC Plaintiff could perform jobs as cashier II, sales attendant, and storage facility rental clerk, all of which are at the light exertional level. (Tr. 54).

The Magistrate Judge concludes that the ALJ's RFC determination is supported by the record. The vocational expert testified that jobs are available in significant numbers in the national economy that Plaintiff can perform. Accordingly, based upon the entire record, the Magistrate Judge concludes that substantial evidence supports the ALJ's decision.

## IV. CONCLUSION AND RECOMMENDATION

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (Docket Entry No. 16) be **DENIED**, and the Commissioner's decision be **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this Report and Recommendation to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this Report and Recommendation within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *see Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 13th day of December, 2017.

/s/ Joe B. Brown
JOE B. BROWN

United States Magistrate Judge